The next case today is United States v. Kathy Chin, Appeal No. 20-1050 and United States v. Michelle L. Thomas, Appeal No. 20-1051. Attorney Griffin, please introduce yourself for the record and proceed with your argument. Good morning, Your Honors. My name is Joan Griffin. I represent Kathy Chin. Mr. Bobo and I have divided the time amongst us. I would like to reserve two minutes for rebuttal. Thank you, Your Honors. I know this panel and this court is familiar with this large indictment regarding the Women Compounding Corporation, so I will proceed straight to my client. Kathy Chin had just had her first child in 2010 when she took a job as a part-time pharmacist in the shipping department. She worked there for a total of about two years, during which time she had her second child, and during that time, Michelle Thomas took over for her during her maternity leave. Now both of these pharmacists found themselves as defendants 11 and 12 in this 14-defendant indictment over the tragic events that we're all aware of. These defendants were charged with dispensing prescription drugs without a prescription. This is a long indictment, 73 pages, with detailed allegations about the confirming process at NECC pursuant to which prescriptions are confirmed, and none of those allegations went to these defendants. These defendants in the indictment were alleged to have done a shipping check in the shipping department. Based on that, these defendants moved to dismiss the indictment on the grounds it didn't allege that they dispensed the prescriptions. Judge Sterns agreed, and we came up to this trial specifically, whether their jobs in the shipping department, including the responsibility to check for prescriptions. And so we went back and tried the case, and the answer is clear, their jobs did not include that responsibility. That was done in another department with other pharmacists. Now, right there, that makes this case different from that of Alla Stepanitz, which was also before this court. Ms. Stepanitz did work in the confirming department and checked prescriptions. Ms. Griffin. Yes, sorry, I know your name. I just thought Judge Barron also had a question. The jury rejected the argument you're making. There was evidence that the form that your clients had to execute was a form requiring the signature of licensed pharmacists. There was also testimony from a State Department of Public Health witness saying that a requirement and an obligation of being a licensed pharmacist in Massachusetts would have required them to act as though they had, in fact, been the person assembling the drugs for a particular patient and certifying. So, based on those things and a few other evidence for the conclusion that it reached. So, what are, let's put aside evidence deficiency, do you have any legal arguments as to why they could not possibly be found to be dispensing drugs? Well, Your Honor, I'm not sure that we can do that putting aside sufficiency. You're right that the defendants did fill out a shipping checklist that was filled by a pharmacist, but the evidence is undisputed that did not include the obligation to check the prescription. You're also right, and this is all... Excuse me. Your argument depends on their employment relationship and that their employer did not tell them that any such obligation was imposed on them. But, the expert testimony was that they did have such an obligation. And that's the problem, Your Honor. Mr. Penta was not qualified as Okay, it's an abuse of discretion standard of review. We have said repeatedly, you don't have to label someone an expert, and indeed, many trial judges have a good reason not to do that in jury trials. So, again, what is the error there? Well, the error, Judge, is in admitting Mr. Penta's testimony. And it is crucial because that's all the government has at this point. Mr. Penta did two things. He read from the Code of Massachusetts Regulation, the pharmacy ethical guidelines, which said nothing about a defendant working in a corporation, a pharmacist working in a corporation. And then he offered the opinion, based on nothing at all, that a pharmacist who factual basis for that testimony, even if the court says he doesn't have to be qualified as an expert. There's no factual basis, specifically neither at NECC or any other corporate pharmacy, to say that a pharmacist had to do a different job. And nor is there any legal basis. The government can cite no case for that. Ms. Griffin, I had a different focus that I wanted you to address. I take the major theme of your brief to be focused on whether your client can be found to have dispensed a drug. That's true, that and intent, but yes. But there's a minor premise or minor theme that I understood to be, even if they dispensed a drug, the drug was not actually a prescription to any patient. Because, as I understand it, there's not a bit of evidence in the record that any patient actually got any drug without a valid prescription. That is correct, Judge, and we have made that argument. We believe the jury instructions also require that. So, I do understand the government's point that you can be guilty of dispensing a drug without a valid prescription to a patient, even if it first goes through an intermediary. But, as I understand your point here, this is not that case, because the intermediary that it went through ended up being an intermediary that then dispensed the drugs to patients with prescriptions. Given that there were hospitals and medical facilities, we have no reason to think otherwise, and there's no argument otherwise. If that's right, am I right in understanding you to be saying there just can't be a conviction here because there can't have been a crime? That is absolutely correct. We absolutely say these drugs went to facilities. They never went to individuals. They were always actually administered by doctors. These are not drugs that actually went into patients' hands, that they took the pills themselves. These were drugs that were being injected into people in clinics, used in surgeries. These were actually administered directly by doctors, and so we say this doesn't account at all for dispensing to an individual. I may be close to the end of my time. I will just move quickly to intent. The government's argument on intent here is that these defendants could have seen the prescription order form in the package that went to the shipping department. I just want to be clear. There's no evidence at all that Kathy Chin ever saw the prescription order form or ever saw a fake name, and I do want to point out here an error in Judge Stearns' decision on the Rule 29 motion. He says the government offered evidence that these defendants saw the prescription order forms at times and initialed them. He does that at my addendum page 12. That simply is not true. There's no evidence. The government doesn't allege it. There are so many defendants in this case. I do want to make sure that we don't just get confused here, but as to my client, there's no evidence she ever saw the prescription order form or any fake name, and she never needed to look at that form to do her job. Basically, Judge, at times the government, when arguing these many motions, we've been doing this for years, and at some point... What was the evidence that she didn't need to look at the form to do her job? The evidence, and it's cited in my brief, Judge, is to do her job, she had to look at the invoice, which did not contain the patient names. She was checking that the right drug was going to the right facility. How did that evidence come in at trial, I mean? The packages came in through the government's witnesses, Your Honor. The invoices and pictures of the actual packages themselves, the product packages. I included some in my addendum here, and you can look at that. You can see on the invoice where there's actually check marks on the invoice next to the name of the drug, the size of the drug, the name and address of the facility. The only thing they had to actually look at the packages for was to match the lot numbers. But there was no need to look at the prescription order form, and Judge Stearns is finding that they actually initialed those forms, or there was any evidence to that effect, is simply a mistake. Not surprising given so many defendants here, and giving, for example, Alice Defenance, who did look at that prescription order form to do her confirming. But my client never saw, there was no evidence she ever saw that, or would have needed to look at it. Ms. Griffin, there are two defendants here, and as you say, the other one filled in for your client for a while, while she was out on maternity leave. And yet the other defendant, presumably based on looking at the same information, went to talk to management about her concerns that things perhaps were not being done in accordance to law. So if she could do that, why couldn't the knowledge that the names Donald Duck, Mickey Mouse, so on and so forth, were obviously fake names? Well, Your Honor, Michelle Thomas, when she noticed those names she questioned, it was a week after she had started at New England Compounding. She wasn't, let's say, even up to speed. There's no checking job. She was busy, she was doing an important pharmacist job of checking that the right drug order was going out, and the government put in no evidence. I think you've missed my point. If Ms. Griffin was doing the same job as your client, and saw the names, and raised concerns, why couldn't the jury infer that your client also saw the names, which were an obvious tip-off that there was something wrong? Your Honor, I don't think that that evidence is sufficient to support that inference. I just don't. There's no evidence my client actually ever saw any names. There's no evidence she had time to read all of these names. There's no evidence that all the names she looked at were obvious. The first name on the one I included in my addendum is James Stewart. After I got this case, I was informed that that's some famous TV person. I didn't even know that. So, that's, it's just an inference way too far to take Michelle Thomas' happening to see one, and to say that Kathy Chin necessarily knew they were fake names. Chief Judge, I had one last set of questions that I just wanted to pursue that follow on the exchange you and I had about the significance of the fact that these drugs all ended up going, I'm going to just assume for a second, all ended up going to patients with valid prescriptions, or at least that there's no evidence that any of them failed to go to a patient with a valid prescription. One thing that's odd in the case is there are these fake names. The fake names serve the function of enabling lots of drugs to go from an ECC to someone else without a valid prescription. Okay? I take, if I'm understanding the significance of your references to office use and all of that, that what what you are suggesting or that if that conduct by NECC is problematic, it's problematic because it violates a different provision of law than the misbranding statute. That's correct, Judge. And so that it may be they could have charged NECC with some criminal violation for being a manufacturer, and maybe they could have charged your client with aiding and abetting the manufacturing without a license or something like that, but since they charged her with misbranding for introducing a drug into commerce without a valid prescription to a patient, that just can't be a crime because that didn't happen. Is that the idea? I do agree with that, Judge, and it's on a couple of levels. First, it just didn't go to a patient. Second, NECC at this time was a large... Go to a patient. It didn't, it wasn't... It did go to it. If I understand your argument, your argument that is best for you is that it did go to a patient, but when it went to a patient, it was pursuant to a valid prescription. Well, I think there's two ways to looking that. One is that, yes, it was pursuant to a valid prescription that was written up by a doctor. The second one is, I don't think a prescription was needed for these things. If a doctor is administering a drug during an operation, there's no prescription written to the patient for that drug as far as I know. Is there a provision of law that would help us figure out that in that instance also there's no problem because it can go to a patient when it's administered by a doctor without a prescription? I assume there must be some a lot. That's right, and one would think so. I mean, I'm only aware that this provision requires dispensing to a patient, and if that's not happening here, then this provision is not violated. If I could pursue Judge Barron's questions. I believe your argument comes down to a burden of proof argument. The jury could find that she knew it was going to institutions and not patients, and you then are making the assumption that because of the nature of the institutions, they complied with the obligation of seeing that there were in fact real patients. I understood your argument to be that it is up to the government to prove that assumption, and they did not put in any evidence on that point. In some ways, that goes to the issue of intent of your client. Judge, that is correct. That's right. It's the government's burden to prove that there were no actual prescriptions here and no real patients who got these drugs, and they didn't put in any evidence on that fact. To clarify the last, that doesn't go to intent, though. That goes to the element of the offense that it has to be pursued, that the drug was far enough. That's correct, Judge. I have also argued that the fact that in the shipping department, the one thing she did know was that they were going to facilities, so that would undercut any inference of intent to violate the statute regarding prescriptions. I have argued that as well. That's a distinct argument. Yes. I think my time is up. Further questions? No. All right. Thank you. You've reserved some time. If you would mute your devices, we'll hear from Mr. Barbeau. Yes. May it please the court. Michael Barbeau on behalf of Michelle Thomas. Now, Ms. Thomas and Ms. Chin, as you well know, were charged and found guilty of not only the liability misbranding statute, but based on shipping drugs with fake names, but also of doing so with the felony intent to defraud and deceive. It is that felony enhancement that I'm going to address. Now, we've learned from the Fifth Circuit and United States versus Arlen, and from the Tenth Circuit and United States versus Mitchell Tree that, and I'll quote, to subject the defendant to a felony sentence requires the government to establish not only the violation was willful, but that it was committed with a specific intent to defraud and mislead an identifiable government agency. Now, the government argued at trial that Ms. Thomas and Ms. Chin's knowingly participated in the scheme to defraud, actually the same scheme that was alleged in counts three that they were not charged with, to defraud regulators, and that was based on the testimony of Ronzio, the managing director, and this is found in the government's closing argument, and it's in the appendix at volume 1779 to 783. But Ronzio's testimony, which was objected to, was not evidence of anything as to Ms. Chin and Ms. Thomas. His testimony was admitted solely as background information concerning NECC. There's absolutely no evidence that Ms. Thomas, who was there for such all of four months, was aware of any schemes. The emails that were admitted were well before she even arrived there. Now, the government's argument... one of the fake names and was concerned enough about it to say something, and then after having done that, continued to perform her function, why wouldn't that be enough for a jury to infer that she knew of the problem and kept acting? Well, when she learned of the problem within just a few days of her arrival and saw the problem with some fake names, she brought it to their attention and the names were corrected. There was a whole resubmitted order where the correct names were submitted. So she did her job and she got the names corrected. The next order, she just simply didn't see. But assuming the jury did see that there was one additional order that went through with fake names, not so obvious. Is the idea that a jury could not have concluded that, given that she didn't keep checking after having seen the first fake one, she must not have minded if they went to fake ones? But her job was, again, to make sure, as Ms. Griffin has explained, to make sure the right drugs went to the right facilities. And even assuming that she kept doing the job, but there was only one other charge subject to that March 12th, a few weeks later, that dealt with shipping drugs with fake names. That's the only charge we're dealing with. There's no evidence that she knew of any scheme. There's no evidence that she knew that there were regulators. There's no evidence that she had anything to do with the continuing policy of shipping fake names. There was the two instances and the two instances alone, one that got corrected and the one we don't know whether it did in fact get corrected. But we do know that they did go to a medical facility. The interesting point is the government now has even changed its argument for what it argued at trial. It's now saying that simply based on the regulations governing the obligations of pharmacists, that alone is enough for the jury to find an intent to defraud and deceive. But deceive who? Deceive regulators who she has no knowledge of. She had no participation in the regulation of a compounding pharmacy. She worked in the shipping department. It wasn't to deceive any government agency. It wasn't to deceive the medical facilities who are the ones that actually were creating the fake names in order to get the needed drugs for their doctors. And it wasn't to deceive the ultimate patients because they were being treated with the drugs that were provided there. So this new theory of the government said that the jury somehow could have raised an inference of the obligations of the pharmacists as a basis for finding fraud and deceive just isn't supported by any evidence. Any evidence that she knew, number one, what the regulations were, there were regulators involved, what was required, and how it was going to deceive these regulators. So simply on behalf of Ms. Thomas, I suggest that there's no evidence that she did anything other than try to do her job correctly within the four months that she was there and then she left. Nothing more to suggest that she in any way, in any intent to defraud and deceive any regulators. Thank you, Mr. Bourbeau. Additional questions from the court? If you would mute your devices. Thank you. Mr. Krom, whenever you're ready. Your Honors, may it please the court, Randall Krom on behalf of the government. I'd like to start with the sufficiency issues because there's a number of pieces of the government's evidence that are significant here that have been left out. There's been the discussion of Penta's testimony that a verifying pharmacist would typically be expected to check. There's been note of the fact that there's at least some evidence that Michelle Thomas did, in fact, note an error in one of the names to bring someone's attention. There's actually more direct evidence than that, which has been entirely ignored here. First is that Steve Sanda testified that pharmacists in the back were supposed to check everybody's work to make sure they were not missing anything. And that's Appendix Volume 1 at 553. And Lillie Cedrone also worked at NACC testified that the role of the verifying pharmacist was to make sure the orders were correct before they were packed to be shipped out. And this is at 511 Appendix Volume 1. So there's testimony much more directly about their role. Their suggestion has always been that wasn't my job, essentially. But there was direct evidence that their job did include checking more than what was reflected in the four corners of the sheet that they filled out. The mere fact that their sheet did not have a checkmark for names did not require the jury to disbelieve the testimony of others that, in fact, their job included more than that sheet suggested. I would also point out further, because this was another point that I think has been misrepresented, is the suggestion that they did not need to look at the order form in order to complete their task. But it begs DeepSan to testify that that was what they used to check against the verification sheet. And this is on page 562 of Appendix Volume 1. And of course, that makes sense. If you're verifying the order, you're going to look at the order itself as it came in, and you're not going to look at something else like the invoice that NACC produced, because any error might already have happened. If there was an error in the amount or type of drug, that would have happened at the data processing point. The invoice would already have that error. So you have to look back at the original order. Are you saying that they did see the patient names then? I'm saying that the testimony in the case was that they had to compare the order to the verification sheet. In other words, they were verifying the order sheet. And again, this is also, I think, not reflecting maybe fully in the briefing, but the testimony was that the order came basically clipped to the front of the folder with the mylar bags and the drugs associated with it to the pharmacists. So the order was right there. In fact, the mylar bags for the drugs also included patient names. Those were also clipped to the front. Those were the first things the pharmacists saw. And when the pharmacists were done, the testimony from Sanda was they stapled their verification sheet to the order form and put it back in the folder and returned it. So they had to handle it. They had to look at it. And that's how they did their job. So the suggestion that somehow they could have just missed these names, which are the first column, is, I think, not realistic. Mr. Crumb, can we get to the point that Judge Barrett was asking about? Let's assume they saw the orders. Let's assume the jury could conclude they recognized fake names. There is still the question of whether they could infer, because I believe this to be true, the shipments were being made to hospitals, to emergency rooms, to clinics, that even if those institutions got the drugs under fake names, that they would not themselves then turn around and prescribe the drugs for patients without using proper names, and that the government did not put on any evidence about what happened at the recipient institutions. So could you address that point? Yes, absolutely. I think that the key point to understand is this was a pharmacy operating as a pharmacy, and the testimony of PENSA was unequivocal, and the testimony, in fact, of every NEC person who testified was unequivocal, that they were required to ship pursuant to valid prescriptions. They weren't allowed to ship on the supposition that somebody else would later distribute to a valid prescription. That was the business model they were attempting to do, but they knew that they couldn't legally do it, and there are messages here from Catton, and everyone says, we're a pharmacy. We can only ship drugs on the basis of valid prescriptions. Just two questions about that. One, is it the logical implication of your position that all the doctors who sent the fake names aided and abetted this crime? I don't know that they essentially did, because we don't know exactly what their, for one thing, they weren't necessarily licensed pharmacists. They weren't necessarily knowledgeable of the law, and I don't think, you know, here we have people who are charged with, chargeable with that knowledge, based on the testimony of the trial, that as pharmacists, they knew what they were able to do. The people who were sending in names may have been people who were merely clerks, who were merely saying, I need to, you know, somebody saying, you need names, here's some names. That doesn't necessarily rise to the level of culpability, because aiding and abetting requires sort of knowing involvement, and I don't think it even does if you, again, as your Honor, in the most recent opinion of Stepanetz, even if you take the view of causing the introduction of misbranded drugs, they're not playing a role there, too. They are not dispensing or causing the introduction of misbranded drugs, or at least not, they don't, one could say, don't have a responsible share in so doing, because all they're doing is providing information. So we would not argue that they would be charged. They certainly weren't, but I don't think that that would, that on these facts, they would automatically be within the scope of liability. Can I ask a related question, Mr. Cromb? So I know there was an instruction on dispensing, and there's a definition of delivery, but the instruction on dispensing refers to the end user. Was there an instruction on end user? There wasn't, and I think there's a couple responses I would have to that instruction. One, I would say, the Supreme Court's decision in Massachusetts, I think, has made clear that on sufficiency review, we look at the actual elements of the offense without regard to the instructions. In fact, it's very clear that instructions simply no role in sufficiency review. Since this is a sufficiency issue, I don't think we need to look at that. I also think... Here's why I think we do. What I'm getting at is the question that's been put to you, which is that there has been no proof that there was delivery to an end user by the defendants. Well, Your Honor, and I guess I was anticipating that part of your question in the answer I gave. So we concede that the definition of dispensing itself includes a delivery to the end user. Now, in light of what this court said, in fact, in the Stepanet's opinion, we think that that's wrong. In fact, that's not a requirement of the term dispensing. That's a definition the court came up with to bind the term dispensing, and we didn't object, and nobody objected, but our view is that on sufficiency review, again, Massachusetts, I think, is clear. We look at the elements of the offense, and as I think this court has set forth in Stepanet, do not require delivery to the end user as a component of dispensing. That's because you argued to us in Stepanet that the hospitals, etc., I thought were not the end user. They were an intermediary, and that there was no problem because you still could dispense to an end user if it went through an intermediary. So I had understood your argument in Stepanet, and consistent with the instruction, to depend on the crime arising because it went to a patient without a valid prescription, not because it went to one of the hospitals without one. Well, and not having participated in that argument, I'm not exactly sure. I can't say respond exactly to the consistency or inconsistency, and I can look into that. What's the intermediary? Is there an intermediary here? The argument in Stepanet, and you referenced this in your 28J letter, is the concept of intermediary. What is an intermediary in this context? Well, I guess, Your Honor, if I could just step one back a little bit because I want to understand this question in what I understand to be its proper context. I mean, the offense of misbranding is causing to be introduced into interstate commerce a drug without a valid prescription. I mean, that's the misbranding offense that's charged. This was a pharmacy obliged to send drugs into interstate commerce with prescriptions that were sending out drugs without valid prescriptions. So that's the underlying offense. Does that mean there cannot be an intermediary on your theory? No. To be honest, my argument is more that the offense was complete when it was shipped without a valid prescription identifying an actual end user. That suggests there was identified an end user. There was a recipient. I just don't want to get lost in the semantics here, but there was a recipient was identified. It just turned out to be a fake one. Who is the end user? I think, again, it was not a defined term within the instruction. And I'm not sure what the end user of the recipient of the drug was the person, the institutions to which it was shipped. The end users of the drug were who eventually got it, but the offense did not depend. Under the statute, does the crime occur upon the first recipient of the drug? No. Under the government's theory, and I guess this is supported both by the indictment and the actual instructions, which is the introduction of a misbranded drug into interstate commerce. And if the drug is misbranded, it was issued without a valid prescription. And does that occur at the moment it first leaves the pharmacy and is received by someone else, or does it occur and is completed only when it reaches a patient? My understanding would be complete when it leaves the pharmacy because it's complete. That is now introduced into interstate commerce without a valid prescription. And that was the underlying offense. Again, the indictment is very clear about that. The instructions to the jury were in fact consistent with that, although the end user concept appeared instructions on dispensing. The actual instructions on what you had to find was that defendants caused the introduction of drugs into interstate commerce, a valid prescription was required, and they were dispensed without a valid prescription. So the argument was that they caused the introduction of these drugs without a valid prescription. And indeed, their defense was not primarily that that wasn't true, but that Barry Cadden was the one who was responsible for not having a valid prescription. Last question on this. Given the pending issues in Carter and the questions about whether your reading of the statute is correct in that no pharmacy, including a compounding pharmacy, can engage in anticipatory compounding without committing a felony? And does your argument in this case depend on us agreeing with you in Carter? And if not, how not? I think it doesn't. And I think that one of the difference is so for one thing, it's a question of what the evidence was and what the arguments were in that in this case, as I understand it, and I wasn't participant in the Carter case, there was voluminous evidence about debates that have gone on about anticipatory compounding. There were experts and government witnesses that testified about that. And there was quite a lot of evidence that talked about what a person would know. And this was in the context of a charge of a client conspiracy in which the question is whether the government was defrauded. And one of the issues was what would the government reasonably have understood and what was the state of the law, the federal government. But this was different because I think the testimony was here, what we're really talking about is defrauding Massachusetts, the Board of Pharmacy, which expects pharmacies to operate pursuant to laws that require them to dispense drugs only pursuant to valid prescriptions. They were acting as a manufacturer but holding themselves out to regulators as a pharmacy. And again, that's what the testimony continuously says. If that's right, then the holding that we'd be making here is that any anticipatory compounding, notwithstanding that it might be allowed by the FDA and consciously allowed by the FDA, is a felony. Well, I think the question is, again, in this case, we don't have that. I think if they were deceiving the state Board of Pharmacy, then that would also constitute engaging. The drugs are still misbranded if they are in violation of the state laws. And I think there was evidence here that states have different laws in terms of what they allow. In some states, you know, it's allowed. Mr. Pong, if I can pursue this with a couple of questions. As I understood this case, there was no objection to the instructions given. There was no request for an instruction defining end user, which is why you keep saying this is a sufficiency challenge and that's how we should think of it. Is that correct? That's correct. Okay, second question. I thought your case depended on not the broad category of anticipatory prescriptions, but on the use of obviously fake names in an effort to hide the fact that they were not, in fact, a regular pharmacy, but they were a manufacturer. And that it is the use of the obviously fake names that is, if you will, the more limited category of anticipatory pharmacy. But Judge Barron is by far the expert on these cases. One piece to it so you can answer it, Mr. Kham, because the question seems to me important to answer. With respect to the intent, and I've been using the word felony, which implicates the intent to defraud. With respect to the intent to defraud, I think it's certainly right that it would go to the defrauding of the regulator. But your position, I think, independent of what they were doing to dispensing of even a single drug without a valid prescription, is a violation of the misbranding statute. So it would render all anticipatory compounding unlawful. And I think I would, I do think Judge Lynch is right to point towards the narrower. I mean, this case did not involve those arguments. And I don't want to say because I don't know. Mr. Kham, just to be. Judge Lynch's questions certainly go to the intent to defraud point. And you're free to answer that. But your position that we should uphold the misdemeanor convictions, doesn't it have the necessary consequence of rendering all anticipatory compounding unlawful under the misbranding statute? The reason I'm hesitant to answer that is the world of anticipatory compounding more generally is not presented by this case. This was a case of a particular entity that held itself out as a pharmacy. And again, pursuant. That's what anticipatory compounding is. It's only conducted by people that hold themselves out as pharmacies because they're not wholesalers and they don't have manufacturing licenses. There's nothing else. Well, but I understand that I would differ in one way. And again, I don't want to go beyond my limited knowledge of that, the concept of anticipatory compounding and say anything more broad than I really can comfortably say. But I would say that the point here is that I understand that anticipatory compounding can be done pursuant to valid prescriptions. I do understand that. Anticipatory compounding is when you send it without a valid prescription because you're anticipating. Well, then I guess, again, without merely speculating, again, I don't know a lot about my position is that introducing a drug without a valid prescription violates the statute. The only reason I'm expressing a little bit of frustration is the government has brought a number of cases to this court and the arguments interact with one another in various ways. And we're trying to resolve what this scheme is. And it would be helpful to us to understand how this all interacts from the perspective of the federal government, which administers the criminal misbranding statute and the FDA provisions, both of which you're making arguments about people should go to jail for how they relate to one another. So it does seem a little bit relevant whether you're positioned that in Carter, how it operates here. If the idea of the government is pressing is that all anticipatory conduct compounding is unlawful because of the misbranding statute, that's important for us to know. If it's not the position of the government, that's also for us important for us to know. Well, then I would be happy to. And I think the better course would be to respond to that in a that's inconsistent or unhelpful to the court by saying something that doesn't mesh with other arguments that have been made or the facts of cases to which I have no direct knowledge. And here we are is more limited case of information that was the testimony related to state regulation, not to federal regulation, but to what the requirements of pharmacists and pharmacies under state law and the role of these pharmacists, which we again, believe the evidence was sufficient to show that they did know. To be clear, if you address this issue, I understand that it's tied now to defrauding the state regulators because you're reserving on the question of whether the federal regulators would have allowed it. But the consequence of concluding that there was defrauding of the state regulators is to make a federal statute criminalizing this conduct, which you would also be suggesting the federal government through the FDA may have allowed. And that does raise some pretty significant questions about preemption. I'm aware, I understand those concerns that I do want to try to address them, but I would say that Mr. Klom, we will await after you have time to consult with your colleagues for you to send us a letter in response. But I just have a sort of factual question about all of this. You know, hospital emergency rooms need to stock certain commonly used and some uncommon drugs in anticipation of patients coming in. So let's say they don't have the names of the patients. Let's say we're going to list them as patients one through 500. When in fact they need to be administered the drugs, we will put patient names on them. So I understand the case at bar is not that situation. It was a situation of using obviously fake names. But what about the situation I've just hypothesized on your theory of the case? Is it a misdemeanor? I think your answer would have to be, yes, it is on your theory of the case. For a pharmacy to do that, and again, I think one of the things that's being left out here, the situation your honor proposes of needing to have things on the shelves, that's what drug manufacturers do. They're regulated much more tightly. They have to meet very high standards. So the difference here is that a pharmacy was trying to do something that a manufacturer is permitted to do and regulated heavily to do exactly that thing, but a pharmacy can't. Just so you don't lose sight of the point when you answer this to us, that is what implicates the questions in Carter. And I'd like to know the government's position on that because the FDA with respect to the Carter case, there is certainly, and Judge Stearns found this, a fair amount of evidence that the FDA does not require you to be a manufacturer to engage in the situation as a pharmacy that Judge Lynch just described because of the need for the compounded drugs that certain compounding Right. And I understand that that was the issue that was in Carter. And again, I do want to address it. Could I have one minute to just one brief point that I didn't have a chance to or not? Yes, go ahead. And that was just simply to say on the question of knowing of intent, I would say this court has many times said that one can infer intent from circumstances, including association with people with knowledge. And in case like as the United States versus SBK, where a drug said he didn't know what the drugs were. They said the fact that he was involved with others supports inference he did know. I think United States versus Merrick is a particularly important case. This is 548 F 3rd 147 person with the tax case claiming he didn't have intent to defraud the IRS because he didn't know about the audit. And they said because it was common knowledge in the office, everybody knew about the audit. And so he didn't, there wasn't direct evidence he knew, but that they could infer he knew and intended to defraud. And here the same thing. It was common knowledge in the office, they needed valid prescriptions, they didn't have them. And they engaged in sort of a subterfuge to hide that fact. And I think that along with the direct evidence of the role of pharmacists and the testimony of sand and so drone is, is sufficient to find that they acted with intent to defraud when they repeatedly signed these verifications based on fake names. Mr. Crumb, if Chief Judge Howard will indulge me. It strikes me this is not the usual 28 J letter situation at all. This is not a local question. It is not even a question which is confined to DOJ, which must be involved in providing an answer. It seems to me DOJ needs to consult with the FDA as well. If you're going to take an official position about criminal prosecutions in this before you answer the question, how much time do you need? Well, I think it would be nice to have at least the time for a briefing, you know, 30 days or some amount of time because this amounts to more like supplemental briefing and the need for consultation. So I would say at least that much time. Got it. That's what you will get. And if your honors want to establish any other number of pages or anything, but I think this does from what you're asking and I understand the significance here and the importance of it bringing together multiple pieces of this case that we just want to make sure we're providing sufficient information. Yes, as well as an opportunity for appellants to respond. Yes, we'll take care of that. Thank you. Thank you. Ms. Griffin. Thank you, Judge. I appear to be back. Just to be clear, the defendants have always argued that we didn't dispense and NECC didn't dispense because the drugs went to facilities with doctors and not to individual patients. So that is our argument. We preserve that the entire time. And obviously, it's more been fully fleshed out with the Carter-Canigliaro briefing. But I addressed that in my brief. And that is our argument. To address briefly what the government said regarding the evidence that they looked at the prescription order form. I've looked at the page cited by Mr. regarding Mr. Sanda. He says, I don't really know if it was on top or bottom. I mean, I never really looked at it. I've read three pages of it. I don't know what he's referring to. So I'll simply refer your honors to his sites. But the bottom line is, the government didn't offer any evidence that these defendants had to look at the prescription order form to do their job, or that Kathy Chin ever saw a fake name, which I remind you, the court was a minority of the hundreds of thousands of names she looked at over the course of her job. Ms. Griffin. Um, it's one thing to say they don't necessarily have to look. It's another thing to say the orders were in front of them, either on the top or the bottom of the box. And they had plenty of opportunity. Which argument are you making? Well, your honor, to try to answer that question, there is no evidence that these defendants had plenty of opportunity to look at these forms. And the government has to do more than simply say the paper was there to prove that they knowingly shipped out without names. Just to be precise, are you saying the paper wasn't there? Or no, I am not saying the paper was not in the package. But what I'm saying is the government hasn't proved that they would have looked at that paper, or indeed that they had the opportunity to look at the paper. There is no dispute here that their job was limited to the four corners of that checklist. The government has no evidence. And there's no basis for inferring that an employee whose job is a checklist actually has a job to do something beyond the checklist, which these defendants did not. And it's their obligation to put on some evidence that she looked at those prescription order forms, that she saw those names. And they put on no evidence of that. And in fact, all the evidence is to the contrary. The evidence is that they looked at other documents. And the fact that the prescription order form was in the entire package that went through all of the departments, including the clean room, where the pharmacist was making up the drug, that doesn't support an inference that that pharmacist looked at those names or had time to look at those names, which they didn't. Now, I do want to address briefly the very beginning, where I think Your Honor asked, well, you know, Michelle Thomas, she saw that there was a fake name on one of these things. She brought it to her supervisor's attention. And I think what you said is she kept acting. But the question is kept acting as what? Her job was shipping clerk to check that the right drug was going to the right facility. It was not her job to check the patient names. And even if she did catch an error that was being taking place in the confirming department on one occasion, that does not make her complicit in their wrongdoing if they did something wrong. I mean, that doesn't constitute aiding and abetting. Aiding and abetting requires knowing intent to help someone commit a crime. And there's no evidence of that here. Even if someone noticed a name, that doesn't change your job requirements. You bring it to someone's job. There is no crime, or there is a crime, but it's not the one charged here of simply possibly having knowledge that someone else is committing a crime. And to suggest that because you're a pharmacist, that because you're a pharmacist working part-time in the shipping department, you have obligations beyond your assigned job, there is no law or factual basis for that. And if you look at Park, which is the only case that describes the obligations of an employee at a corporation, it simply does not support this argument that a pharmacist working in the shipping department has obligations to supervise the head of the company working somewhere else. That isn't what Park says. If I can just say one second, and that is simply, Park says an agent is liable if they have the responsibility and the power commensurate with the responsibility to do the job as required. These defendants didn't have that. Thank you. Thank you, Your Honor. That concludes the argument in this case. Attorney Griffin, Attorney Borbeau, and Attorney Crum, you should disconnect from the hearing at this time.